**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | |
|---|---|
| **CLARIANT CORP** | **CASE NO. 6:26-CV-04371** |
| **VERSUS** | **JUDGE JAMES D. CAIN, JR.** |
| **SOLUGEN INC. ET AL** | **MAGISTRATE JUDGE CAROL B. WHITEHURST** |

# MEMORANDUM RULING

Before the court is a Motion to Dismiss for Lack of Personal Jurisdiction [doc. 19] filed under Federal Rule of Civil Procedure 12(b)(2) by defendant Grant Williams; a Motion to Dismiss for Lack of Personal Jurisdiction, Improper Venue, and Failure to State a Claim [doc. 30] filed under Federal Rules of Civil Procedure 12(b)(2), 12(b)(4), and 12(b)(6) or, in the alternative, Motion to Transfer under 28 U.S.C. § 1404(a) by defendant Solugen, Inc. ("Solugen"); and a Motion to Dismiss for Lack of Jurisdiction, Motion to Dismiss for Improper Venue, or in the alternative, Motion to Transfer Case [doc. 47] filed by defendants William Bruckmann and Jonathan Wylde. Plaintiff Clariant Corporation ("Clariant") opposes the motions. Doc. 61.

## I.
## INTRODUCTION

This suit arises from the alleged unauthorized acquisition, transfer, and use of a sample of HYTREAT DF 12851A ("HYTREAT"), a proprietary low-dose hydrate inhibitor ("LDHI") product used in offshore oil production, from plaintiff Clariant to its direct competitor, Solugen. HYTREAT is pumped through an "umbilical," the bundled

subsea conduit connecting an offshore platform to subsea well equipment, to help ensure that oil can be extracted safely and remain suitable for refining. Doc. 2, att. 1, ¶ 5. Umbilicals are each worth between $15 million and $25 million. *Id.* at ¶ 6. Chemical incompatibility can plug the umbilical, force shut-ins, and cause downtime and lost revenue. *Id.* If two LDHI products are shown to be compatible, an operator might transition between them without using incurring additional costs. *Id.* at ¶ 7. Compatibility testing and field trials are therefore commercially significant in the LDHI market, especially for offshore producers, because they allow suppliers to market their products as suitable for additional wells and operators. *Id.* at ¶ 8.

Clariant is "a global chemical manufacturing company" incorporated in New York, with its principal place of business in North Carolina. Doc. 1, ¶¶ 5–6. It has a significant position in the LDHI market and its predecessor obtained a patent over HYTREAT in 2008. Doc. 2, att. 1, ¶ 9; *see* U.S. Patent No. 7,381,689 (issued June 3, 2008). Although the patent expired in January 2026, Clariant continues to protect HYTREAT's formulation, exact composition, and testing information. Doc. 2, att. 1, ¶¶ 13–15. Clariant restricts access to information concerning HYTREAT formulation, testing, and manufacturing even within its own organization. *Id.* at ¶¶ 14–15.

Walter Oil & Gas ("WOG"), a company with offshore Gulf of America production platforms, is a longtime Clariant customer and one of its largest HYTREAT customers. *Id.* at ¶ 19. WOG signed an exclusivity agreement with Clariant in December 2025, under which it received preferential HYTREAT pricing in exchange for not using a competing LDHI product. *Id.* Defendant Joshua Perkins was employed by Clariant as a district

manager and sales service manager since 2013, when Clariant acquired his previous employer. *Id.* at ¶ 18. In his role with Clariant he was responsible for the WOG account for nearly a decade. *Id.* at ¶ 20. Accordingly, he primarily worked out of WOG's Houston office and was involved in WOG's HYTREAT daily operations and injections. *Id.* Perkins also served as regional "Quality Champion" on Clariant's HYTREAT steering committee, which gave him access to restricted information concerning HYTREAT. *Id.* at ¶ 16. As a Clariant employee, he attended periodic compliance and ethics training. *Id.* at ¶ 25. Clariant's Code of Ethics, with which Perkins was familiar through this training, emphasizes employees' obligation to protect the company's confidential information. *Id.* at ¶ 26; *see* doc. 2, att. 3, p. 54.

Occasionally, Clariant customers require a sample of HYTREAT or other products for compatibility or fluid testing. Doc. 2, att. 1, ¶ 28. Clariant's procedure is for the sample to be requested through a salesperson and then provided, usually from Clariant's laboratory in The Woodlands, Texas, to an outside laboratory. *Id.* Sample requests are typically submitted through the Oil Services Sample Requests SharePoint and the samples are then tracked through Clariant's Sample Request System after being shipped. *Id.* Clariant thus determines and agrees in advance where the sample will be sent and the reason for testing; it does not ship samples without knowing their destination and purpose. *Id.* Clariant also requires a nondisclosure agreement when sending samples to an outside laboratory or other third party. *Id.* at ¶ 29.

On August 26, 2026, contrary to established procedures, Perkins obtained a one-liter HYTREAT sample by requesting it directly from a laboratory technician while picking

up an oil sample for WOG at Clariant's laboratory in Broussard, Louisiana. *Id.* at ¶¶ 30–32. Perkins's supervisor, Ashley Hunt, became suspicious when she learned about his visit to the Broussard laboratory because she was aware that Clariant's competitor, defendant Solugen, was developing an LDHI. *Id.* at ¶ 35. When asked about the request by his supervisor, Perkins stated that he was taking the oil sample to Clariant's laboratory in The Woodlands but did not mention that he also took a HYTREAT sample. *Id.* at ¶ 34. Clariant then initiated an investigation. At a compliance interview on September 9, 2026, Perkins gave conflicting answers about the reasons for his trip to the Broussard laboratory and stated that he had picked up the HYTREAT sample at the request of defendant/WOG superintendent Grant Williams. *Id.* at ¶¶ 38–42. He could not account for the sample's current location or explain his failure to mention the HYTREAT sample when he was first asked about his trip to the Broussard facility. *Id.* at ¶¶ 41, 43. After informing Perkins that obtaining the sample in this manner was improper and directing him to retrieve and return it, Clariant terminated his employment for cause on September 14, 2026. *Id.* at ¶¶ 44–45.

Clariant subsequently learned that, shortly after Perkins's compliance interview, Grant Williams contacted a contractor on WOG Platform 910 and asked him to send a HYTREAT sample to Clariant from its operational inventory. *Id.* at ¶ 47. The request stated that the sample was urgent, needed to come in on the next flight, and was to be delivered to Houston. *Id.* Clariant surmised that Williams caused this second sample to be sent onshore in an effort to present it as the original sample that Perkins had obtained and provided, through Williams, to Solugen. *Id.* Ashley Hunt, Perkins's Clariant supervisor, also spoke to Williams on the day of Perkins's compliance interview. *Id.* at ¶ 49. Williams

told her that the original sample was sent to a third-party laboratory to "get some flow assurance done." *Id.* The following day, he identified the laboratory as Pinnacle Engineering and stated that the sample had been sent for compatibility analysis. *Id.* When Hunt called Pinnacle Engineering, personnel there told her that it had no laboratories and could not perform the type of compatibility or field testing claimed by Williams. *Id.* On September 11, 2026, Williams called Hunt and stated that he had retrieved the sample from Pinnacle Engineering. *Id.* at ¶ 50. Clariant has since received a letter from Solugen admitting that it received a sample of HYTREAT and returned it to Williams on September 10, 2026, allegedly unopened and unused. *Id.* at ¶ 51; *see* doc. 2, att. 2.

The alleged conspiracy extends to two ex-Clariant employees now working for Solugen, William Bruckmann and Jonathan Wylde. Doc. 1. Bruckmann, who left Clariant in 2023 as Head of North America Offshore, Oil Services, is currently Vice President of Commercial Development at Solugen and has a long professional relationship with Perkins. Doc. 2, att. 1, ¶ 55. Wylde left Clariant in 2022 as Head of Global Innovation and now serves as Vice President of Technology and Innovation at Solugen. *Id.* at ¶ 57. A WOG employee informed Clariant on September 24, 2026, that WOG personnel had previously met for lunch to discuss transferring WOG's business to Solugen, with Williams, Bruckmann, and Wylde in attendance. *Id.* at ¶ 54. At the lunch Williams stated that Perkins had started working for Solugen. *Id.* Clariant also learned that Perkins had pushed back the order time for a September 10 shipment of HYTREAT to a WOG platform. *Id.* at ¶ 59. Clariant was informed the next day that WOG no longer needed the shipment because it planned to use its remaining HYTREAT inventory and then test Solugen's LDHI. *Id.* at ¶

61. Hunt was informed by a Clariant senior account representative that Williams had asked him to keep the Solugen product field trial secret from other Clariant personnel. *Id.* at ¶ 63. Clariant learned from the Broussard laboratory that Bruckmann had notified it that Solugen had obtained all of WOG's business and that 150 totes would be sent for cleaning to meet industry standards. *Id.* at ¶ 64. It also learned from offshore personnel on WOG's platform that Williams had directed them to drain Clariant's product and begin using Solugen's product. *Id.* at ¶ 65.

On September 25, 2026, Clariant sent cease and desist letters to Williams, Perkins, Bruckmann, Wylde, and Solugen. *Id.* at ¶ 66. Each letter alleged that a HYTREAT sample had been obtained without authorization and that the sample and any data derived from it were being used in connection with the testing, marketing, or commercialization of a competing LDHI. *Id.* at ¶ 66. Clariant thus demanded, *inter alia*, that the recipients immediately cease and desist from any unauthorized testing, use, disclosure, or marketing of the HYTREAT sample and any information derived from it. *Id.*

Clariant filed suit in this court on October 20, 2026, against Solugen, Perkins, Williams, Bruckmann, and Wylde. Doc. 1. Against all defendants it claims violations of (1) the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836; (2) the Louisiana Uniform Trade Secrets Act ("LUTSA"), La. R.S. § 51:1431 *et seq.*; and (3) the Louisiana Unfair Trade Practices Act ("LUTPA"), La. R.S. § 51:1401 *et seq.* It also raises state law claims of tortious interference with business relationships and conversion against all defendants, and breach of fiduciary duty against Perkins only. Finally, it asserts claims of

civil conspiracy and civil RICO, 18 U.S.C. §§ 1962(c), 1962(d), and 1964(c), against all defendants.

Clariant has moved for a temporary restraining order and preliminary injunction against all defendants, restraining and enjoining them from several actions relating to HYTREAT and alleged protected information that might have been derived from the sample. Doc. 2. They also seek written certification regarding the chain of custody of the sample. Doc. 2, att. 7, p. 5. The court granted the TRO and set the preliminary injunction for hearing. Doc. 8. Meanwhile, Williams moved to dismiss the suit against him for lack of personal jurisdiction and Solugen moved to dismiss the suit for lack of personal jurisdiction, improper venue, and failure to state a claim, with an alternative request to transfer the matter to the United States District Court for the Southern District of Texas. Docs. 19, 30. Bruckmann and Wylde have likewise moved for dismissal based on lack of personal jurisdiction or improper venue or, in the alternative, for the court to transfer the case. Doc. 47. Clariant opposes these motions. Doc. 61. In light of defendants' agreement to extend the TRO pending a resolution of the challenges to venue and personal jurisdiction, the court suspended briefing deadlines on the Motion for Preliminary Injunction [doc. 2] and thus handles these motions without reaching the merits of the case.

## II.
## LAW & APPLICATION

### A. Governing law

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of establishing the court's jurisdiction over a nonresident defendant. *E.g.*, *Ham v. La Cienega Music Co.*, 4 F.3d 413, 415 (5th Cir. 1993). The court may determine jurisdictional issues through evidence outside the pleadings. *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985); *Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 343 (5th Cir. 2002). When the court rules on the motion without an evidentiary hearing, the plaintiff's burden is only to make out a *prima facie* case of personal jurisdiction. *Trinity Indus., Inc. v. Myers & Assoc., Ltd.*, 41 F.3d 229, 230–31 (5th Cir. 1995). At this stage the court must take uncontroverted allegations in the pleadings as true and resolve any conflicts in the parties' affidavits in the plaintiff's favor. *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990). In resolving the motion the court may consider "affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985). The court need not credit conclusory allegations, however, even if uncontroverted. *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001).

Personal jurisdiction over a defendant exists if (1) the forum state's long-arm statute extends to the defendant, and (2) the exercise of such jurisdiction is consistent with due process. *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008). Louisiana's long-arm statute extends as far as permitted by due process, merging these two

factors. *Rainey v. J&S Truck Sales, LLC*, 614 F.Supp.3d 293, 299 (M.D. La. 2022) (citing *Petroleum Helicopters, Inc. v. Avco Corp.*, 834 F.2d 510, 512 (5th Cir. 1987)). The exercise of personal jurisdiction over a defendant comports with due process only if (1) the defendant has purposefully availed himself of the protections of the forum state by establishing "minimum contacts" therewith and (2) the exercise of personal jurisdiction over the defendant does not offend traditional notions of fair play and substantial justice. *Allred v. Moore & Peterson*, 117 F.3d 278, 285 (5th Cir. 1997).

Minimum contacts may be established through either general or specific jurisdiction. *Ford v. Mentor Worldwide, LLC*, 2 F.Supp.3d 898, 903 (E.D. La. 2014). General jurisdiction arises from "continuous and systematic" contacts with the forum state, even when the cause of action bears no relation to those contacts. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–16 (1984). Specific jurisdiction, on the other hand, is case-linked and confined to "adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

Only specific personal jurisdiction is at issue here. In the Fifth Circuit, courts evaluate the issue with a three-step analysis. *Deep South Comms., LLC v. Fellegy*, 652 F.Supp.3d 636, 652 (M.D. La. 2023) (citing *Nuovo Pignone v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002)). First, the court determines whether minimum contacts exist between the defendant and the forum state. Then the court considers whether the cause of action "arises out of or results from the defendant's forum-related contacts." *Id.* Finally, if the plaintiff satisfies the first two prongs, the burden shifts to the defendant to defeat

jurisdiction by showing that an exercise thereof "would be unfair or unreasonable." *Id.* (quoting *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006)). Plaintiff's burden on the first two prongs, as set out above, is only to make out a prima facie case. *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008). Meanwhile, the defendant's burden on the third prong is to establish a "compelling case" against the exercise of jurisdiction. *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999) (quoting *Burger King*, 471 U.S. at 477).

**B. Application**

As shown from the extensive factual background, the allegations in the complaint relating to Louisiana center on Perkins's alleged misappropriation of a sample from Clariant's Broussard laboratory. Clariant maintains that these actions were undertaken based on a conspiracy with other individual defendants. But conspiracy allegations cannot be used to impute one defendant's jurisdictional contacts to another. *Eagle Metal Prods., LLC v. Keymark Enterps., LLC*, 651 F.Supp.2d 577, 593 (N.D. Tex. 2009) (citing *Delta Brands, Inc. v. Danieli Corp.*, 99 F. App'x 1 (5th Cir. 2004)). Instead, "[e]ach defendant's contacts with the forum must be analyzed individually, and a defendant cannot be subject to personal jurisdiction solely because he . . . participated in an alleged conspiracy with a co-conspirator who had contacts with [the forum state]." *Garcia v. Peterson*, 319 F.Supp.3d 863, 888 (S.D. Tex. 2018) (quoting *Logan Int'l Inc. v. 1556311 Alberta Ltd.*, 929 F.Supp.2d 625, 630–31 (S.D. Tex. 2012)). Further, the plaintiff must establish that the alleged conspiracy was aimed at the forum state and "that the alleged tortfeasors had knowledge that a particular [forum state] resident would suffer the brunt of the harm." *L.G.*

*Motorsports, Inc. v. NGMCO, Inc.*, 2012 WL 718594, at *4 (E.D. Tex. Mar. 6, 2012) (quoting *Hawkins v. Upjohn Co.*, 890 F.Supp. 601, 608–09 (E.D. Tex. 1994)).

Clariant, however, argues that the conspiracy targeted its Louisiana-based LDHI business, which depends on relations with Louisiana offshore oil and gas platforms. With its opposition Clariant provides a supplemental affidavit from Ashley Hunt, who gave the factual background to the complaint and motion for preliminary injunction. Doc. 61, att. 1. She states that both Bruckmann and Wylde "have made it publicly known that they are antagonistic toward Clariant and committed to using proprietary knowledge and information gained while employed by Clariant to interfere with [its] Louisiana offshore business." *Id.* at ¶ 4. Bruckmann has made job offers to several Louisiana-based Clariant employees since he joined Solugen and traveled to Louisiana multiple times over the past year "in an effort to solicit employees and Clariant's HYTREAT business[.]" *Id.* at ¶¶ 5–8. Bruckmann and Wylde have also "targeted [Clariant employees] in sales and technical roles, including Defendant Perkins, but also others at Clariant who had similar relationships with other Clariant customers as [Perkins] did with [WOG]." *Id.* at ¶ 5.

Despite its corporate office in Texas, Clariant's LDHI business depends on its Louisiana presence. All batches of HYTREAT are housed in and shipped from the Broussard facility. *Id.* at ¶ 10. All HYTREAT products ordered by WOG and destined for its Louisiana offshore platforms were routed through the Broussard facility. *Id.* at ¶ 12. The WOG platform at the center of Clariant's allegations, Platform 910, is located fewer than 80 miles off the Louisiana coastline and staffed by Island Operating Company ("Island"), which is based out of Scott, Louisiana, and operates platforms off Louisiana's Gulf Shore.

*Id.* at ¶¶ 13, 15. After Perkins's alleged misappropriation came to light, defendant Williams contacted an Island representative based in Louisiana to obtain a replacement sample and to prevent the movement of Clariant personnel on WOG platforms. *Id.* at ¶¶ 14, 18. He also made alleged misrepresentations to Hunt, who was then located in Louisiana, when he denied knowledge of where the HYTREAT sample had been sent. Doc. 1, ¶ 73. Finally, Solugen was in the process of building its own LDHI blending and storage facility in Welsh, Louisiana, as of September 2026. Doc. 61, att. 1, ¶ 19. Solugen maintains, however, that those plans have not come to fruition and that it currently has no Louisiana property, offices, employees, or sales. Doc. 64, att. 1; doc. 30, att. 2, ¶¶ 2–6, 9.

Clariant's allegations, taken as true and supplemented by its affidavits, demonstrate that Bruckmann and his employer, Solugen, had sufficient involvement in the alleged conspiracy and sufficient individual contact with Louisiana in the execution thereof to support a finding of minimum contacts. Assuming that these allegations would be made part of the complaint, Bruckmann's alleged travels to Louisiana on Solugen's behalf to poach employees from Clariant show deliberate incursions into the forum state as part of Solugen's alleged tortious interference with Clariant's LDHI business. Because the claims against them arise out of these contacts, Clariant has satisfied both prongs of its burden. Further, given the proximity between this court and the Houston area, where defendants are located, as well as the defendants' business-related contacts in this state, the court cannot find that an exercise of personal jurisdiction over Solugen or Bruckmann would offend traditional notions of fair play and substantial justice.

As to defendants Jonathan Wylde and Grant Williams, however, even Hunt's supplemental affidavit provides scant information on his jurisdictional contacts. Hunt vaguely asserts that Wylde targeted Clariant employees "including [Texas-based] Defendant Perkins" and announced his hostility to Clariant's Louisiana-based LDHI business. Doc. 61, att. 1, ¶¶ 4–5. Wylde states in his own affidavit that he has resided in Texas since 2013, even though he was employed by Clariant until 2022. Doc. 47, att. 2, ¶¶ 2, 9. He works in the Houston area and did not travel to a Louisiana facility to collect a HYTREAT sample or obtain information about a HYTREAT sample in Louisiana, and did not "request, direct, or authorize any person to travel to Louisiana, or take any action in Louisiana, in connection with any of the events alleged in the Complaint." *Id.* at ¶¶ 5–8. Accordingly, there is no evidence that he traveled to Louisiana, met with individual Louisiana-based employees, or otherwise took any steps in furtherance of the conspiracy in or directed at the forum state.

Clariant relies chiefly on Williams's contact with an offshore platform and members of a staffing company based out of Louisiana. But the platform is nearly 80 miles off the Louisiana coast, on the Outer Continental Shelf. The OCS is "an area of exclusive Federal jurisdiction" under federal law. 43 U.S.C. § 1333(a)(1)(A). Williams's incidental contact with Louisiana-based contractors in an alleged effort to cover up his role in the conspiracy—by way of requiring a product to be flown from the platform to **Texas**, not Louisiana—does not show purposeful availment of the forum state. Nor can his lone telephone call with Ms. Hunt, who does not even allege that she is regularly based out of Louisiana or that Williams knew she was in Louisiana at the time, support a finding of

minimum contacts. Instead, the allegations against Williams show that his contact with Clariant centered on its Texas-based employees.

Further, Clariant fails to show that the conspiracy was targeted at Louisiana to such a degree that the other defendants' contacts should be imputed to Wylde or Williams. Relying on *Hoffman v. Bailey*, 996 F.Supp.2d 477 (E.D. La. 2014), Clariant asserts that minimum contacts are established as to Wylde and Bruckmann because, by contacting Louisiana-based Clariant employees, they "could foresee that [their conduct] would result in harm to Clariant's business relationships occurring in the forum." Doc. 61, p. 21. It also maintains that Williams "knew from his participation in this conspiracy as well as his longstanding relationship with both Clariant and Defendant Perkins" that his alleged request for the HYTREAT sample would require Perkins to travel to Louisiana, and that his actions were generally directed at Clariant in Louisiana to undercut its business relationships. The court has found sufficient contacts as to Bruckmann, because he actually traveled to Louisiana and made job offers to individuals in the state. No party has challenged the court's personal jurisdiction over Perkins. But mere foreseeability of harm is not enough for Wylde or Williams. *Hoffman* is based on an application of the "effects test" established by the Supreme Court in *Calder v. Jones*, 465 U.S. 783 (1984), which "is not a substitute for a nonresident's minimum contacts that demonstrate purposeful availment of the benefits of the forum state." *Allred v. Moore & Peterson*, 117 F.3d 278, 286 (5th Cir. 1997). Instead, *Calder* requires actions "expressly aimed at the forum state" as well as the alleged tort-feasor's knowledge "that the brunt of the injury will be felt **by a particular resident in the forum**[.]" *Southmark Corp. v. Life Investors, Inc.*, 851 F.2d

763, 772 (5th Cir. 1988) (emphasis added). Although Clariant's HYTREAT operation involves Louisiana facilities, the company is not a Louisiana resident. Nor, as shown from the number of Clariant employees and clients in Texas, is its LDHI business confined to Louisiana. Accordingly, Clariant cannot establish minimum contacts between defendants Wylde or Williams and the state of Louisiana. The court thus lacks personal jurisdiction over these defendants.

As an alternative to dismissing a case under Rule 12(b)(2), a district court is authorized "to transfer the action to 'any district or division in which it could have been brought' if the court finds that it is 'in the interest of justice' to transfer the action." *Herman v. Cataphora, Inc.*, 730 F.3d 460, 466 (5th Cir. 2013) (quoting 28 U.S.C. § 1406(a)). Both specific and general personal jurisdiction may be exercised over all defendants in the United States District Court for the Southern District of Texas. Moreover, as emphasized in defendants' venue objections, many of the underlying events occurred in the Houston area and many witnesses will be located in that district. Clariant, as a global company with offices in Texas, is equally at home in that district as in Louisiana. The federal courts in Texas are also familiar with applying the law of Louisiana. *E.g.*, *Dennis v. Chesapeake Energy Corp.*, 2010 WL 3941879, at *4 (E.D. Tex. 2010). Because this court cannot exercise personal jurisdiction over defendants Wylde or Williams, and because all claims against all defendants can be litigated in another, equally convenient forum, the proper remedy is to transfer the matter under 28 U.S.C. § 1406(a).

## III. CONCLUSION

For the reasons stated above, the court will **DENY** the Motions to Dismiss for Lack of Personal Jurisdiction [docs. 19, 30, 47] and instead **TRANSFER** this matter to the United States District Court for the Southern District of Texas based upon its finding that it lacks personal jurisdiction over defendants Jonathan Wylde and Grant Williams. Further, the court will **DENY** the Motions to Dismiss for Improper Venue and Motions to Transfer [docs. 30, 47] as **MOOT**. The Motion for Preliminary Injunction [doc. 2], Motions to Dismiss for Failure to State a Claim [docs. 30, 59], and Motion to Vacate [doc. 34] remain pending for adjudication by the transferee court.

**THUS DONE AND SIGNED** in Chambers on the 24th day of November, 2026.

**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**